UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UTSAVI DEVANG DESAI, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>ALISSA EMMEL,<br><br>        Defendant. | Case No.  25-cv-05123-RFL<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 28 |

Plaintiffs are four EB-5 visa petitioners.  The EB-5 visa program grants permanent residency to noncitizen investors that create U.S. jobs.  Plaintiffs made their investments through a "regional center" that pools investments into specific projects.  After Plaintiffs made their investments and submitted their visa petitions, Congress imposed new requirements on regional centers in the EB-5 Reform and Integrity Act of 2022 ("RIA").  In some instances, noncompliance with those requirements requires termination of a regional center.  Congress protected good-faith investors in noncompliant regional centers by giving them an opportunity to make a new investment or reassociate the project in which they had invested with a new regional center.

According to Plaintiffs, the regional center for their investments did not pay the RIA's mandated fees and was therefore required to be terminated.  Normally, upon termination, Plaintiffs would be entitled to the good-faith investor protections of the RIA.  But U.S. Citizenship and Immigration Services ("USCIS") did not immediately terminate the regional center.  Instead, it told Plaintiffs that it first intended to deny their visa petitions for failing to demonstrate the viability of their investment projects.  Plaintiffs protested that their regional

center was slated for mandatory termination, and asked USCIS to terminate the center before adjudicating their petitions, so that they could make their investments through a new regional center as permitted by the good-faith investor protections.  USCIS refused, moved forward with the visa denials, and then terminated the regional center months later, thereby making the good-faith investor protections unavailable to Plaintiffs.  Plaintiffs allege that the denial of their visa petitions violated the RIA and the Administrative Procedure Act.  Alissa Emmel, an official at USCIS, now moves to dismiss Plaintiffs' complaint.

Plaintiffs plausibly allege that USCIS acted contrary to the RIA and arbitrarily or capriciously when denying their visa petitions before terminating the regional center.  However, Plaintiffs were required to exhaust their administrative remedies before filing suit.  They failed to do so and have not plausibly alleged their failure to exhaust can be excused.  Accordingly, as further explained below, Plaintiffs' claims must be dismissed without prejudice.

## I.      BACKGROUND

### A.       The EB-5 Program

In 1990, Congress created the EB-5 visa program, a path to permanent residency for noncitizens that create U.S. jobs by investing in new U.S. commercial enterprises.  Immigration Act of 1990, Pub. L. No. 101-649, § 121(a), 104 Stat. 4978, 4989–90 (codified as amended at 8 U.S.C § 1153(b)(5)).  The program's requirements have changed over time.  Initially, applicants had to demonstrate that their investments directly created a specified number of jobs.  *Id.*  In 1992, Congress created a pilot program under which applicants could pool their money in a "regional center" instead of directly investing in a commercial enterprise.  Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1993, Pub. L. No. 102-395, § 610(a), 106 Stat. 1828, 1874 (1992).  The regional center would then invest in new commercial enterprises.  8 C.F.R. § 204.6(m).  Even though such an investment would only indirectly create jobs, an applicant still qualified for an EB-5 visa so long as enough jobs were created.  8 C.F.R. § 204.6(m)(7).  Congress reauthorized the regional center program numerous times, so it "became a 'pilot' in name only."  *Behring Reg'l Ctr. LLC v. Mayorkas*,

No. 22-CV-02487-VC, 2022 WL 2290594, at *2 (N.D. Cal. June 24, 2022).

Over time, though, "concerns grew that the regional center program was susceptible to fraud and abuse." *Id.* (citing *Mirror Lake Village, LLC v. Wolf*, 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring)). In response, Congress enacted the EB-5 Reform and Integrity Act of 2022 ("RIA"). Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. BB, 136 Stat. 49, 1070–1109 (codified primarily at 8 U.S.C. § 1153(b)(5)). As implied by its name, the RIA substantially reformed the EB-5 program, particularly regional center requirements. Regional centers are subject to sanctions for failing to comply with those requirements. For instance, regional centers are required to pay an annual fee. 8 U.S.C. § 1153(b)(5)(J)(ii)(I). At the relevant time in this case, the due date for the annual fee was April 2, 2023. Notice of EB-5 Regional Center Integrity Fund Fee, 88 Fed. Reg. 13141, 13141–42 (Mar. 2, 2023). The Secretary of Homeland Security "shall . . . terminate the designation of any regional center that does not pay the fee required under clause (ii) within 90 days after the date on which such fee is due." § 1153(b)(5)(J)(iv).

Seemingly recognizing that these sanctions could have harsh consequences for investors unaware of noncompliance, the RIA included protections for "good faith investors." § 1153(b)(5)(M). Generally, upon a regional center's termination, an "otherwise qualified petition . . . or the conditional permanent residence of a[] [noncitizen] . . . shall remain valid or continue to be authorized, as applicable." § 1153(b)(5)(M)(i). The Secretary must then notify associated investors about the regional center's termination. § 1153(b)(5)(M)(i)(II). Additionally, the investor must receive an 180-day window to make a new qualifying investment or associate the commercial enterprise they invested in with another regional center. § 1153(b)(5)(M)(ii).

Finally, the RIA added an administrative exhaustion requirement for EB-5 program decisions. USCIS was required to establish an administrative appeals process for "any determination made under this paragraph," including "a petition by a[] [noncitizen] investor for status as an immigrant under this paragraph." § 1153(b)(5)(P)(i). "[T]his paragraph" is

3

§ 1153(b)(5), which is where the RIA sets forth most of the EB-5 provisions.  Subject to limited exceptions, "no court shall have jurisdiction to review a determination under this paragraph until the regional center, its associated entities, or the [noncitizen] investor has exhausted all administrative appeals."  § 1153(b)(5)(P)(ii).

### B.    The Complaint's Allegations

The following is a recitation of the Complaint's allegations, which are required to be taken as true at this stage of the proceedings.

Plaintiffs are four[1] EB-5 visa petitioners.  (Dkt. No. 1 ("Compl.") ¶¶ 3–5, 7.)  Each invested in USFC Fund 18, LLC, associated with a regional center named Texas Longhorn Investments, LLC.  (*Id.* ¶ Introduction.)  They made their investments and submitted associated EB-5 visa petitions in 2019, several years before Congress enacted the RIA.  (*Id.* ¶ 75.)

The leaders of Texas Longhorn "ostensibly no longer wished to continue its specific operations with the post-RIA EB-5 Regional Center Program."  (*Id.* ¶ 56.)  It did not pay the required annual fee by the April 2, 2023 deadline, nor submit required annual forms.  (*Id.*)  Even 90 days after the first annual fee became due (July 1, 2023), Texas Longhorn still hadn't paid.  (*Id.*)  At that time, USCIS took no steps to terminate it.  (*Id.* ¶ 57.)  Between October and December of 2023, USCIS received several letters from Texas Longhorn itself encouraging termination of USFC Fund 18 to allow the associated applicants to make new investments.  (*Id.* ¶¶ 58–61, Ex. B.)  Nevertheless, USCIS still took no action.  (*Id.*)

Instead, starting around November 2023, USCIS issued Notices of Intent to Deny ("NOIDs") to EB-5 visa petitioners affiliated with Texas Longhorn.  (Dkt. No. 1-2 at 8.)[2]  The NOIDs purportedly explained that USCIS intended to deny the petitions for lack of progress on the projects that Plaintiffs invested in.  (*Id.*)  In response, Plaintiffs' counsel noted that USFC Fund 18 was requesting disbarment and asked USCIS to act on the termination of Fund 18 before

---

[1] The Complaint names seven plaintiffs, but three voluntarily dismissed their claims.  (Dkt. No. 33.)
[2] All citations to page numbers in filings on the docket refer to ECF pagination.

adjudicating their visa petitions.  (Dkt. No. 34-1 at 10–12; *see also* Dkt. No. 37 at 7 (referencing Plaintiffs' letter).)  USCIS nonetheless denied Plaintiffs' petitions between February and March of 2024.  (Compl. ¶ 75.)  USCIS did not take any action against Texas Longhorn until July 1, 2024, when it issued a Notice of Intent to Terminate.  (*Id.* ¶ 65.)  It finally terminated the regional center on July 29, 2024.  (*Id.* ¶ 69.)  USCIS did not notify Plaintiffs of the regional center termination, nor did it allow them an opportunity to reassociate their petitions with new projects.  (*Id.* ¶¶ 72, 76.)

Defendant Alissa Emmel is Chief of the Immigrant Investor Program at USCIS and "oversees the adjudication of all EB-5 related matters."  (*Id.* ¶ 8.)

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When considering such a motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  "Dismissal is appropriate when the complaint lacks a cognizable legal theory or sufficient factual allegations to support a cognizable legal theory." *Saloojas, Inc. v. Aetna Health of Cal., Inc.*, 80 F.4th 1011, 1014 (9th Cir. 2023) (cleaned up).

## III.    ANALYSIS

Plaintiffs assert five causes of action: (1) a claim for a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that Emmel's actions violated the Administrative Procedure Act ("APA"); (2) an APA claim that their visa petition denials were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); (3) an APA claim to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1); (4) a claim for a writ of mandamus under the Mandamus Act, 28 U.S.C. § 1361; and (5) a fee award under the Equal Access to Justice Act.  Each is addressed

below, though the analysis as to the remaining claims is largely derivative of the ruling on the APA claim.[3]

### A.    APA Claims

#### 1.    Contrary to Law

The APA requires a court to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A). As an initial matter, some of Plaintiffs' theories do not state a claim under the APA. Specifically, Plaintiffs argue that Emmel violated the RIA by (1) failing to terminate Texas Longhorn on July 1, 2023 (when its termination became mandatory); and (2) failing to provide Plaintiffs with the good-faith investor protections, including notice and an opportunity to reassociate with new EB-5 projects.

First, the RIA did not require termination of Texas Longhorn on July 1, 2023. The Secretary of Homeland Security is required to terminate a regional center that is more than 90 days late paying the annual fee. *See* 8 U.S.C. § 1153(b)(5)(J)(iv)(II). Accordingly, after July 1, Emmel was mandated to terminate Texas Longhorn since it was over 90 days late paying the annual fee. *See id.* But that provision does not impose a specific deadline by which a regional center must be terminated. This case is therefore fundamentally unlike the authorities on which Plaintiffs rely, where courts have held agencies to deadlines that Congress set—for instance, to adjudicate applications "not later than 180 days" after they are filed. *See Galvez v. Jaddou*, 52 F.4th 821, 826 (9th Cir. 2022) (quoting 8 U.S.C. § 1232(d)(2)). There is no basis to read a similar deadline into the RIA's termination requirement. For example, if Emmel terminated Texas Longhorn on July 2, the one-day delay alone would not have violated the RIA.

Second, the statute is clear that the good-faith investor protections of § 1153(b)(5)(M) only apply if a noncitizen's visa petition is still pending or was approved when a regional center is terminated. Congress only applied these protections to an "otherwise qualified petition," and a

---

[3] Emmel contended at oral argument that the merits of Plaintiffs' claims need not be reached if the Court concluded that they were not administratively exhausted. However, the claims' merits inform whether administrative exhaustion would be futile. Accordingly, this Order first addresses the plausibility of Plaintiffs' claims.

denied petition is not otherwise qualified.  *See* § 1153(b)(5)(M)(i)(I).  A denied petition cannot "remain valid" as it would already be invalid.  *See id.*  Plaintiffs' petitions were already denied by the time that Texas Longhorn was terminated.  (*See* Compl. ¶¶ 69, 75.)  Standing alone, Plaintiffs' failure to receive the good-faith investor protections would not violate the RIA since their denied petitions would not qualify for those protections.

Nevertheless, Plaintiffs plausibly allege that Emmel's actions violated the RIA under a third theory:  that the RIA implicitly prohibits end-running its good-faith investor protections by knowingly waiting to terminate a regional center until associated visa petitions have been denied. After all, Congress specified the Secretary of Homeland Security "shall" terminate a regional center that is more than 90 days late paying the annual fee.  *See* § 1153(b)(5)(J)(iv).  And Congress declared that good-faith investors "shall" receive certain protections upon termination of a regional center unless the noncitizen was a "knowing participant" in the conduct leading to termination.  *See* § 1153(b)(5)(M)(i), (b)(5)(M)(vi).  Congress did not give USCIS any discretion to not terminate a regional center or not afford good-faith investors protection upon termination. Yet Plaintiffs plausibly allege that USCIS nonetheless gave itself such discretion by knowingly refusing to terminate a regional center that had been slated for mandatory termination until after their visa petitions were denied.  (*See* Compl. ¶¶ 58, 65, 72.)  The RIA barred USCIS from doing that.  Emmel contended at oral argument that the RIA would not prohibit a policy or practice of intentionally delaying regional center termination until USCIS denied all petitions associated with that center.  But interpreting the RIA to provide such unbridled discretion would effectively eliminate the mandated good-faith investor protections, since no investor would ever have to receive those protections.  Such an interpretation would run "squarely against the canon of construction that courts interpret statutes so as not to render any section meaningless."  *See Li v. Eddy*, 324 F.3d 1109, 1110 (9th Cir. 2003) (citation omitted).

### 2.    Arbitrary and Capricious

A court is also required to "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  Under this standard, a court

cannot "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Still, a court must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Id.* An agency decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Plaintiffs plausibly allege that adjudicating their visa petitions after termination of Texas Longhorn became mandatory was arbitrary and capricious. At oral argument, Emmel conceded that it could be arbitrary and capricious for USCIS to have a policy or practice of intentionally delaying regional center termination until it denied all petitions associated with that center. Plaintiffs allege that USCIS had such a practice for Texas Longhorn. (Compl. ¶¶ 54, 57–58, 62–63, 70.) While Emmel contends that the allegations do not support that conclusion, Plaintiffs allege that USCIS knew it must terminate Texas Longhorn, did not do so for approximately a year, but denied Plaintiffs' petitions squarely in the middle of that period. (*Id.*) In response to the notice of intent to deny their petitions, Plaintiffs specifically requested that decisions on the petitions associated with Texas Longhorn be held in abeyance until its associated entities were terminated, but USCIS refused. (Dkt. No. 34-1 at 11–12, 19.) It therefore appears to have "entirely failed to consider an important aspect of the problem" by denying Plaintiffs' petitions before terminating Texas Longhorn—namely, that this sequencing would prevent Plaintiffs from receiving the protections mandated by Congress for good-faith investors in noncompliant regional centers. *See Motor Vehicle Mfrs.*, 463 U.S. at 43. Moreover, Plaintiffs have plausibly alleged that USCIS did not appear to advance any other statutory goal through the sequencing that it adopted. While the administrative record may demonstrate Emmel's actions were not arbitrary and capricious, Plaintiffs have alleged sufficient facts to make such a claim plausible.

8

### 3. Compel Agency Action

Finally, the APA requires a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). This authority is limited to when an agency "failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). That is, the act must be "ministerial or non-discretionary." *Id.* (citation omitted). Plaintiffs seek to compel Emmel to perform two acts: (1) timely terminate Texas Longhorn; and (2) notify Plaintiffs of Texas Longhorn's termination and provide them with the other good-faith investor protections. (Compl. ¶¶ 93–99.)

Neither of these acts, however, was unlawfully withheld or unreasonably delayed. As to termination, Texas Longhorn has already been terminated, so its termination could no longer be withheld or delayed. (*See id.* ¶ 69.) Moreover, as explained above, the RIA did not require termination by a particular date, so its termination on the date at issue was not unlawful. As to the good-faith investor protections, the duty to provide those is triggered by the regional center's termination, as explained above. As such, those protections were not unlawfully withheld or delayed. In the end, Plaintiffs' claim is that USCIS should have adjudicated their petitions after the termination of Texas Longhorn, instead of beforehand, not that USCIS withheld or delayed any ministerial or non-discretionary action.

### B. Exhaustion Requirement

### 1. Applicability and Retroactivity

The RIA imposed an administrative exhaustion requirement on EB-5 determinations. 8 U.S.C. § 1153(b)(5)(P)(ii). Prior to the RIA, EB-5 applicants did not need to administratively exhaust their claims before suing in federal court. *See, e.g.*, *Chang v. United States*, 327 F.3d 911, 922 (9th Cir. 2003) (denial of unconditional permanent residence after approved initial EB-5 petition did not require administrative exhaustion); *Zhang v. Nielsen*, No. 18-CV-9799-JFW, 2019 WL 5303276, at *6 (C.D. Cal. Oct. 17, 2019) (denial of initial EB-5 petition did not require administrative exhaustion).

With the change in law in the RIA, this administrative exhaustion requirement now

applies to Plaintiffs.  Congress expressly prescribed the requirement's reach by requiring exhaustion of a "determination under this paragraph."  *See* § 1153(b)(5)(P)(ii).  "[T]his paragraph" is § 1153(b)(5).  Plaintiffs seek application of the RIA's new regional center termination requirement and good-faith investor protections contained in § 1153(b)(5).  *See* § 1153(b)(5)(J)(iv), (b)(5)(M).  A decision regarding whether to apply those provisions would inherently be a "determination under this paragraph," and therefore is subject to the administrative exhaustion requirement.  *See* § 1153(b)(5)(P)(ii).  While Plaintiffs argue that Congress showed no intent to impose this requirement on petitions filed before the RIA was enacted, its use of "determination" rather than "petition" or some other word shows an intent to impose the requirement on any relevant decision made by USCIS after the RIA's enactment.  *See id.*; *Pac. Nw. EB-5 Reg'l Ctr. v. Noem*, No. 25-CV-0597-KKE, 2025 WL 2645656, at *7 (W.D. Wash. Sept. 15, 2025) (concluding same).

The application of this administrative exhaustion requirement to Plaintiffs would not be impermissibly retroactive.  While "[r]etroactivity is not favored in the law," if Congress clearly intended for a law to have retroactive effect, that intent governs.  *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 837 (1990) (citations omitted).  Accordingly, if a statute is enacted after relevant acts have taken place, a court must determine "whether Congress has expressly prescribed the statute's proper reach."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).  Congress has expressly prescribed when the exhaustion requirement should apply, so no further analysis is needed.  *See id.*  Moreover, even if that express prescription were ignored, the exhaustion requirement would not "operate retroactively" with respect to Plaintiffs.  *See id.*  It did not impose "new negative consequences on past actions," because the requirement only changed what Plaintiffs needed to do after receiving an adverse decision, which happened after the RIA was already in effect.  *See Chang*, 327 F.3d at 920 (citing *Landgraf*, 511 U.S. at 269–70).  Nor did it impose consequences "without fair notice, or in a manner that undermines reasonable reliance or upsets settled expectations," since Plaintiffs had fair notice of the RIA at the time they received their adverse decisions.  *See id.*

10

In sum, Plaintiffs are subject to the RIA's administrative exhaustion requirement.

### 2.    Futility

It is undisputed that Plaintiffs have not administratively appealed their claims.  (Compl. ¶ 15.)  However, futility is a general exception to administrative exhaustion requirements. *Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496, 499 (9th Cir. 1980).  It is not obvious whether futility can excuse a failure to exhaust when Congress imposes exhaustion as a jurisdictional requirement, as it did in the RIA.  *See* § 1153(b)(5)(P)(ii) ("[N]o court shall have jurisdiction . . . until the [relevant party] . . . has exhausted all administrative appeals.").

Assuming without deciding that futility is an exception to the RIA's exhaustion requirement, an administrative appeal does not necessarily appear futile.  Exhaustion is generally futile when an agency "firmly states it may not and will not do" what the plaintiff seeks.  *Chang*, 327 F.3d at 925; *see also Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 105–06 (D.C. Cir. 1986) (collecting cases and summarizing futility as when further agency action would be "clearly useless").  Since an administrative appeal could give Plaintiffs the relief they want, this standard is not met.  Plaintiffs seek a reversal of USCIS's denial of their petitions and, upon reopening of the petitions, the notice and amendment opportunity required by the good-faith investor protections.  Neither party disputes that such a remand is a potential administrative appeal outcome.  (Dkt. No. 34 at 13; Dkt. No. 37 at 7.)  While Emmel argues that the RIA does not require Plaintiffs to receive the good-faith investor protections, she does not argue that USCIS is prohibited from providing Plaintiffs that relief.  To the contrary, Emmel argues that USCIS has unbridled discretion over the sequence by which it terminates regional centers and adjudicates associated petitions.  (Dkt. No. 28 at 14.)  Accordingly, Emmel doesn't argue that USCIS "may not and will not" reopen Plaintiffs' petitions and provide them with the good-faith investor protections.  *See Chang*, 327 F.3d at 925.  USCIS might choose to change the timing of its evaluation of Plaintiffs' petitions after recognizing the seemingly unfair situation it created.  On the record before this Court, there is no indication that such a decision would require policy creation, contrary to what Plaintiffs suggested at oral argument.

### 3. Equitable Tolling

Finally, Plaintiffs ask for equitable tolling of the administrative appeal deadline. Administrative appeal deadlines can sometimes be equitably tolled. *See, e.g.*, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982) (holding that deadline to file claim with EEOC under Title VII could be equitably tolled). But it is premature to decide if the appeal deadline should be equitably tolled here, since it is not clear when Plaintiffs will file administrative appeals or whether their administrative appeals will be rejected as untimely. Since the APA claims have not yet been exhausted, they must be dismissed without prejudice. If Plaintiffs' administrative appeals are denied as untimely, and the government raises exhaustion as a defense in a subsequent lawsuit, they may raise tolling of the administrative appeal deadline then.

### C. Remaining Claims

The remaining claims are likewise dismissed without prejudice because they rise and fall with the APA claims. First, Plaintiffs seek a declaratory judgment that the APA was violated, which cannot be brought because their APA claim fails due to lack of exhaustion. (Compl. ¶ 81.) Second, since the APA would provide an adequate remedy for Plaintiffs once that claim is administratively exhausted, their Mandamus Act claim need not be separately analyzed. *See Vaz v. Neal*, 33 F.4th 1131, 1135 (9th Cir. 2022). Finally, the Equal Access to Justice Act is not an independent cause of action but instead a fee-shifting provision. *See* 28 U.S.C. § 2412.

## IV. CONCLUSION

Since Plaintiffs have not yet exhausted their administrative remedies, this case is **DISMISSED WITHOUT PREJUDICE**. Plaintiffs may refile their lawsuit after they receive a final decision on their administrative appeals.

**IT IS SO ORDERED.**

Dated: February 20, 2026

RITA F. LIN
United States District Judge

12